The first argued case this morning, or the two argued cases this morning, were the same parties, 2012-11-42 and 2012-14-21. Mr. White, have you all decided how you wish to present these two cases? Yes, Your Honor. I've made my designations with the clerk in terms of splitting my time. I'm not sure how the court would like to proceed in terms of we've got two different appeals and some issues. I might want to shorten that or the court might want to allocate that time. Okay. Proceed. Proceed with the first case. Your Honor's counsel, may it please the court. Last June, this court unanimously overturned the district court below for not drawing reasonable inferences in favor of R&L at the pleading stage. Here, now, you are presented with the same error. This time occurring at the summary judgment stage. When the district court granted summary judgment in the midst of infringement discovery, R&L had conclusively proven that Pitt Ohio practiced six of the seven steps of the 07-8 patent. And when we draw all reasonable inferences in favor of R&L, as we are required to do at the summary judgment stage, R&L had created a genuine issue of material fact as to whether Pitt Ohio practiced the final step of the 07-8 patent, preparing a loading manifest. Now, instead of drawing all reasonable inferences that flow from this evidence in favor of R&L. Well, I mean, we can talk about generalities and about drawing legal inferences, but the last case, in my view at least, was significantly different from the case we have before us today. And the judge, in my view, so you can respond, went through every piece of evidence and every argument you were making with respect to what you had with regard to the second step, the seventh step. So tell us what you had, what is it that she didn't draw a reasonable inference from where you think it's clear that the reasonable inference would have gone your way? Because I'm not seeing it. I mean, it seems to me she analyzed every piece of evidence and everything that has gone down and really at least persuasively wrote that there was no reasonable inference to be drawn in your favor. Your Honor, thank you. Your Honor, the first piece of evidence, and there are several. The first piece of evidence is the fact that Pitt, Ohio actually had discussions with R&L pre-testing of in-cab scanning of bills of lading to license the 078 patent process. Establishing that Pitt, Ohio was in fact, before its testing, interested in practicing the exact patent process that we have here. Second, Pitt, Ohio expressed... When you said that they had discussions and they were interested, that was one point that was unclear from the record. Is it simply that you all went and made a pitch or did they contact you and express an interest? I mean, there's a difference. Your Honor, I'm not entirely clear as to who approached who first. All I know is that there was mutual interest to have a discussion because obviously Pitt, Ohio was there to have the discussion with R&L subsidiary about the patented process. If they had no interest, one reasonable inference that we were entitled to at the summary judgment stage is that if Pitt, Ohio showed up at a conversation to talk about the 078 patent process before its testing of in-cab scanning of bills of lading, they were interested in the 078 process before they actually tested in-cab scanning of bills of lading. From that, we also see the feasibility study that Pitt, Ohio itself prepared after its testing, reporting on what it had learned during these tests. Again, tests of in-cab scanning of bills of lading. What did Pitt, Ohio say that it had learned? It said it had learned that it could, that its workers, by the time a trailer pulls up to the dock, the workers could potentially know everything that is on the truck and exactly where to move it. Let me ask you a practical question. Yes, Your Honor. Let's say on your theory of the case that they tested it and it seems that the weight, if not undisputed, is that they aren't using it. The extent of the damages that you're requesting is the injury caused by the single test. Your Honor, we never got to the point of being able to even discuss and assert the damages. Okay, but that was my question. Is there any basis for damages or for going on with such a case if the limitation, if it's pretty much agreed and undisputed that all they did was test it? Your Honor, that question is unanswered and there could be. For example, if we draw the reasonable inference that Pitt, Ohio knew of the 078 patent process because they expressed interest and actually met with R&L to have a discussion about acquiring the 078 patent process, because we know that Pitt, Ohio was focused prior to testing the in-cab scanning of bill of lading process on speeding up its cross docking and dispatching processes, we could infer that Pitt, Ohio practiced the 078 patent during its testing of it knowing the patented process existed and knowing. I was making that assumption that they tested it. With the knowledge. As far as the record's concerned, it seems quite clear that for one reason or another that was the end of it. Certainly, Your Honor, that seems to be the case. But if they practiced the patent during that test, they practiced our patent knowing that practicing a patent during that test was an infringement of the patent. They did not have a license to practice it in testing. That was a knowing act of direct infringement. And I think that opens up, and we never got the opportunity to explore, the level of knowledge, the level of intent, the level of willfulness. I don't think you're directly answering the question. Is the point of this to establish a direct infringement so you can go after people on that on indirect? Because the district court made some very specific findings that there was no ongoing infringement, and you don't seem to deny that. You seem to be conceding that you're only talking about testing, right? At this stage, Your Honor, we do not have evidence that Pitt, Ohio, conducted in-cap scanning of bills of lading beyond the tests that occurred here. The purpose of the case… So this whole case is about and rests on the testing. And I think Judge Newman's question, and I have a similar question, is what kind of damages were you going to be seeking with respect to a case of infringement that just involved they unlawfully tested this product? Well, Your Honor, we had not even gotten into the question of damages. We had not consulted with our expert on the question of damages. We had not explored any aspect of the question of damages by the time… But what kind of damages could you have hoped to? Okay. I mean, you may not have explored it, but just give us some hint about what the parameters… I mean, you seem to suggest that, well, whatever damages we could get, no matter how nominal, we could have arguably tripled them because it was willful. What are we looking at in terms of the possibilities? Well, one element of willful infringement, Your Honor, is recovering your attorney's fees. If R&L Carriers was forced to bring it… Okay, so you're pursuing a suit in which the only allegation is of unlawful testing, and there are no damages to be identified, but you're bringing the suit for the purposes of being able to obtain the attorney's fees at the conclusion of the suit? Your Honor, we're bringing the suit for purposes of enforcing our patent and for recovering all lawful damages that flow from any direct infringement. I would respectfully submit to the court that to suggest that the case should be thrown out in summary judgment for lack of evidence of infringement because there's no hope of potential damages down the road… Well, no, the judge certainly did a thorough job going through the evidence with respect to even the testing problem. I think we're just trying to figure out what this case was about. The case was about establishing what exactly Pitt, Ohio, did with in-cab scanning of bills of lading when it admitted that it tested this process, and the question was what it did on the back end, and did it in fact… I'm not sure there's an admission or a finding with respect to the testing being infringed. If that's the case, I would agree with that because certainly the district court did not take that position. The district court contended that this was not even a close case with respect to infringement. That was the only extent of the district court's determination, not a determination that we did not prove damages, but a determination that there was not even a hope of evidence in the record that there was infringement. We would submit that when you draw a reasonable inference in favor of R&L, the circumstantial evidence was overwhelming in favor of R&L. I'm the first one, given my background, to say that you have to draw reasonable inferences in favor of the non-movement. That's completely the standard, and sometimes you even know in your gut that they're going to lose, but you have to draw these reasonable inferences. But at some point when the evidence is such that it shows the opposite, inference no longer becomes reasonable. I would submit, certainly in the abstract, Your Honor, that I think that's fair. Here we have a feasibility study after the tests were done by Pitt, Ohio, where they acknowledged... Saying that this might be nice someday. That doesn't mean they're doing it. But when we talk about active cargo, this was active cargo that had to be delivered. And the test that they used, they delivered this actual active cargo, was used in a system that we have evidence to establish, a system that was designed to create a loading manifest at the back end prior to the truck returning to the terminal. That was one of the things the white paper said. This was their technology infrastructure. They plugged in-cab scanning during this test into that existing infrastructure. Isn't it reasonable to infer that when they took in-cab scanning and plugged it into their existing infrastructure that had that capability, that they actually generated a loading manifest on the back end? It would be reasonable to infer if you didn't have sworn testimony to the opposite. The sworn testimony from Mr. Sullivan, he has no idea what happened on the back end. He was not there. He did not speak to any of the witnesses that were involved in the back end. Well, he did. He did talk to a lot of people. I mean, you keep saying that. You keep saying he didn't talk to anyone, but the record is clear that he talked – maybe he didn't talk to Mr. Pavazian. Is that how you pronounce his name? But he talked to a lot of people that were involved in the testing process. He talked to people involved in the testing process, but there are numerous people that were involved on the back end of the testing process that he did not talk to, including Mr. Piavesan, who stated in the feasibility study the exact point. Now, this could be used to practice the 078 patent process, and what a great benefit it would be to Pitt, Ohio. I submit that isn't it reasonable to infer that taking in cab scanning, plugging it into an architecture that creates a loading manifest on the back end before the truck arrives, talking about after that test of the great benefits of actually performing the patent and doing that, and taking active cargo that has to generate a strip sheet in your normal processes, generate a strip sheet, read loading manifest. To get that cargo to the customer and it was actually delivered, doesn't that create the reasonable inference that they actually did this during the process? Can't a reasonable juror conclude, yeah, that maybe they're not telling the truth? Maybe Mr. Sullivan's not telling the truth. At some point in the summary judgment process when there's a well-supported motion for summary judgment, you do have a burden to come forward with more than just inferences. There has to be evidence in the record. Your Honor, I would suggest this, and this court has found this numerous times, that sometimes circumstantial evidence is better than direct evidence of infringement. And sometimes you're not going to be able to bludgeon the defendant into admitting what it did and what it didn't do in the context of infringement. Especially a representative who wasn't involved in the testing process himself at all and didn't speak to several of the key important people who were at the back end, who were the key people deciding whether infringement occurred. Sometimes, sometimes we have to let our juries make a determination of whether somebody is telling the truth or not if we have sufficient circumstantial evidence that perhaps they're not. What happened at the deposition of Mr. Piovesan when you deposed him before the trial court issued her decision? You did not supplement the record with anything from his deposition, nor did you ask for reconsideration based on anything in his deposition. I mean, talk about reasonable inferences. I mean, I think it's a reasonable inference to assume that if he said that they were doing what you think they were doing, that you would have told the court that. Mr. Piovesan, to depose Mr. Piovesan, his deposition is not part of the record. You're right, Your Honor. We did not submit his testimony. We did not submit his deposition. So that, and we were not able to conduct the discovery that we had sought from the trial court. You say that, but there was eight months in which there was a lot of back and forth, and you had plenty of time to conduct discovery. Why didn't you do it then? We were trying to resolve the case informally, Your Honor. We submitted three different declarations to Pitt, Ohio, trying to get Pitt, Ohio to agree so that we could resolve the case informally and walk away from it. Let me talk to you about that. That third declaration, they signed everything except where you wanted them to say that a third party said to another third party something when they weren't even privy to the conversation. How can someone under oath say that such a statement ever occurred? We asked them. Actually, what you wanted to say was that there was a lie. I mean, how can you ask them to say something like that under oath when they weren't present? We weren't asking them. We were asking them whether or not the conversation took place. We were asking them strictly about their conduct. We were asking them to assert. So you were asking them to say that what he said was a lie. Exactly, which is based upon their conduct. If somebody says I am doing something and that is not the truth, to request Pitt, Ohio to say that is not the truth because I am not doing that. Well, they did leave the sentence in that said I am not doing that. They just took out the sentence that had them making a value judgment about someone else's testimony. They gave you everything else you wanted, including the statement that I am not doing that. We evaluated that as being a qualified suggestion that what was stated to Mr. Bowman by PeopleNet CEO, that Pitt, Ohio was in fact practicing this patent, was in some ways Pitt, Ohio trying to be evasive. And, again, keep in mind the context. But you never then came back and said I view that as a qualified statement. Can we have another way to phrase this? You just then went on and then insisted on a deposition. It looks like all you were doing was trying to drag them out and keep them in. Absolutely not, Your Honor. This was us trying to resolve this case. Really? Can you tell me again why that one portion regarding that statement was enough to keep you from settling this case given all of their willingness to sign the remainder of the declaration? What was it about that statement that you thought was so significant? Because it seemed to me they were giving you everything you wanted with that exception, right? So what was that exception about? We believed, Your Honor, that it was a qualified suggestion that they would not establish that the statement that was made by PeopleNet CEO was untrue. So the reason this case didn't settle is you were satisfied with everything they would say about their own conduct, but you wanted them to represent that the statement made by him was a lie, right? Is that a fair characterization of what was done? That we wanted an unqualified declaration. Well, I think we're really running this too far. Let's hear from the other side, and if it's still an issue, we can continue the debate. Are we planning to make appeals in the two different stand-up sessions? Okay, that's fine. Thank you, Your Honor. Thank you. Ms. Jankowski. Thank you, Your Honor. May it please the Court, with me here today is Mr. Depper. He's my partner. He's seated at Council table. He's with me on the break. Would you start off with discussing the feasibility study, the testing? Sure. Because that was the subject of most of the infringement here. Yeah. And the extent to which you think the inferences should not have gone to your friend or should have gone, or whatever. Okay. Yes, the first thing I want to stress on the reasonable inferences is it's reasonable. It's not unreasonable, and it's not baseless inferences. And I believe that when you read the feasibility study without even considering the testimony, there is nothing in that feasibility study that suggests or implies that a loading manifest was, in fact, created from scanned documents. Well, it certainly implies that using this system for loading manifests would be a great idea. I agree with you. It may imply it could be for purposes of maybe billing or something else, one sentence. But what hasn't been addressed… But how does someone report to their supervisor that I'm telling you this is a really great idea without having tested it to see if it's a really great idea? I mean, wasn't that the whole point? The whole point of the test, in terms of what that test was, was to analyze it for purposes of image quality. The testimony on that is undisputed. And if you actually look at the feasibility study, the portions that have not been cited by counsel are the portions that come before it in terms of what actually happened in the test. What the feasibility study says in terms of what happened in terms of the test was a scanner sat in the truck with Mr. Seery. He's the author of that, the same person that Mr. Sullivan spoke to before he was deposed in a 30B6 capacity. There was absolutely no evidence that a loading manifest was ever created. And this idea that it just happens, it doesn't just happen. Once the information comes back, you need to have further processing. And the evidence on that is unequivocal, that there was absolutely no further processing of those scanned images. They remained in a developmental test database. What's the problem? I mean, why put Mr. Sullivan up as your 30B6 witness when he wasn't involved in the test? We put him up as many companies put up a 30B6 witness. He's speaking on behalf of the company. Right, so he's supposed to be very educated about the entire process when he speaks on behalf of the company. I mean, this is one thing that always drove me out of my mind, is that 30B6 witnesses would come in and say, I don't know anything. Understood, but this is not your standard management person. This is a man that was responsible for the gathering of documents. He reviewed every document that was produced in this case. He interviewed people before, which is how he even determined that there was some additional information that wasn't produced. He read, we went through this. This man spent the time, he came in, and he looked up from memory. What about that? You say in your brief more than once that you produced all your documents in January. But it is true that there were, what, 150 documents produced days before his deposition? Right, in connection with the 30B6 document. Why wasn't that search done in January when you had an obligation to produce documents? I don't know the answer to that other than they believed they had everything. And in the course of talking to people, he located these images sitting in a developmental database. And obviously, soon as that was located, which was days before his deposition, we turned it over. Yes, it should have been produced had we known about it. So eight months after your production obligation. I mean, that sounds somewhat sanctionable to me. You have a production obligation and you're saying, well, we found it after we talked to people. Weren't you supposed to talk to people in January? We were, we did, and no one disclosed that information. In the course of, I mean, this man's got a computer background. He's a CIO, and he's the one that was messing around finding the information. No, we didn't locate it. We located other things used in the desk. We obviously turned over numerous drafts, every email we could find from multiple custodians. The people that he talked to and the people that they complain about, all of their emails were searched. Everyone's emails were searched. Those documents were not produced. No, they weren't. And obviously, as soon as we realized it, they were produced.  Why didn't he speak to Mr. Peovizian? Pevozian. Pevozian. He didn't speak with Mr. Pevozian because at that point in time, Mr. Pevozian was no longer employed at the company, and he had spoken to five or six other people, and there really was no question. This was not a hard case in the sense of, is there any question that the patented process was infringed? We knew the patent process wasn't infringed in the text. We knew that. There was no debate about that. There was no reason to talk to him about that specific issue. There was no evidence that the Loading Manifest was ever created, and certainly Paul Seery was in the truck, and Paul Seery was there doing his thing, and the driver was doing his other thing, the normal thing, which was using the G3 to make his deliveries and receiving and sending messages on a screen. There was no reason for him to talk to Mr. Pevozian, and I don't think he had an obligation to talk to a former employee. I mean, I understand they think he does, but there's no obligation to do that. It would be one thing if he was the only person, but he wasn't. But he was a key person. He was the one actually doing the testing, right? No. He was the person that looked at scanned images and said, yeah, I think the quality's good, and he reported that information in the feasibility study. It's not as if a document didn't exist, and the only way to obtain that information would have been from a conversation. That might be a different story, Your Honor. But the document that talked about the image quality is a document that was produced multiple times. So no, I disagree. I don't think he had the obligation, and there's no question that there wasn't the processing. So that's the reason he didn't. And there's nothing in those documents that's problematic from the perspective of a reasonable inference or any suggestion that we, in fact, ever completed the last step of the 07-8 patent. There is no evidence of that. One of the issues that Mr. White brought up at the beginning of his argument was this investigation that Pitt, Ohio, allegedly did. There is not significant evidence of that. There is one statement by them in an affidavit saying they showed the MDT, and there's Mr. Sullivan's testimony that says, yes, they showed it. No, we didn't evaluate it. No, we didn't test it. So there's really nothing to that, and the timing on that, I think, is crucial. The evidence on that point is we're talking early to mid-2000s, and we know the evidence is undisputed that the test at issue was 2009. So no, I would not say that you can draw a reasonable inference from somebody coming in, making a pitch, showing you a piece of equipment. Your Honor asked Mr. White, what is this case about? This case was never about a test. If you look at why the complaint was filed, it had nothing to do with a test. The allegations, of course, all based on information and belief, were that Pitt, Ohio, was using scanners across its fleet. Its fleet. And so once it was very clear that that wasn't happening, that should have been clear in the first conversation. And certainly no one ever looked at archives to find out if that were the case. But having said that, it then turned on to, well, I guess we don't have evidence of that. Let's focus on a test that we freely disclosed. It's not as if they had to drag that out of us. They sent us, as I think the Court is aware, much discovery in the forms of requests for admissions and interrogatories and document requests. And those unequivocally told them about a test, but also made clear at that time that that test did not involve the generation or creation of a loading manifest from scanned documentation data. Do you want to address that they also appeal from the denial of the motion to delay ruling on the summary judgment for purposes of obtaining additional discovery? Yes. And Mr. White alluded to that. Do you want to address that issue? Sure. I would be happy to. At the time that that motion was filed, there had been a considerable amount of discovery. Certainly the request for admissions, two sets of those, interrogatories and document requests, all of which were responded to basically unequivocally. Documents were obviously produced in relation to that. In the May timeframe was when this request for multiple affidavits came in, and yes, after two of them, we were willing to do that. If you look at what was sent, and I think the court has, compared to what was signed, we gave them everything they ever asked for. These were not affidavits that were self-serving. We took their forms and as much as we possibly could without, of course, being untruthful, signed and had somebody sign those affidavits. In addition, they took a 30B6 witness of PeopleNet who weighed in on this white paper and said, no, it doesn't involve scanning. It doesn't involve micro-D and it doesn't involve EBE, which, by the way, were the two companies that they alleged in the complaint we were doing business with. In addition to those issues, they also took the 30B6 deposition of Mr. Sullivan. It was not an hour deposition, as you can imagine. It was an all-day event. And I believe that witness came in and was fully prepared and did answer those questions. And I think Judge Beckwith, in the end, after she, I mean, the entire transcript was submitted to her, and certainly based on the way she wrote that opinion, I believe she read portions of that deposition, if not all of it. In addition to that, they also obtained a declaration that they submitted from micro-D. Was there ever a motion after Mr. Sullivan's deposition to require him to return after additional investigation or anything like that? There was no motion ever presented to the court. There was, and I believe it is in the record, a letter by counsel outlining all of the alleged deficiencies in his deposition, which are consistent with the same arguments that R&L raised before the court. And, obviously, correspondence back from us saying no and addressing some of the issues, which was Mr. Sullivan couldn't remember the name of the driver. We provided that information. They asked for an agenda that demonstrated that he talked about the project with his boss. We provided that information. So, basically, at no turn did we refuse to give discovery. And, actually, as the court has noted, with respect to Mr. Pavosian, the judge very clearly said, I don't think there's any more additional discovery. And they, nevertheless, contacted us and said we want to depose Mr. Pavosian, who we didn't represent. And we had two choices. We could have gone in and filed a motion, and we chose, quite frankly, to just produce the witness. And that's ultimately what we did. And, obviously, that deposition did not make its way to the court. And I do think a reasonable inference can be drawn about why that is. Can you confirm something? So, the letter that's at 1204 in the appendix, you're saying that you all responded to that with additional information? We did, Your Honor. Is there a response? And I just want to check to make sure that the letter that you're talking about is the letter that I was referring to. Okay. Because the appendix is there. I think it is. Okay. If it's the letter from Mr. White to me. September 29th. Yeah, because the deposition was, I think, September 28th. So, yeah, without looking at it, I'm pretty certain that's the letter. And if it talks about why are witnesses unprepared, then it's the letter. We're on the same page. All right. And then you say you responded to this? We responded to it. I do not know if that ever made its way into the record or not without going through the appendix. I don't know if we did. We did respond to it. We definitely produced additional documents. The agenda, I know, that's referenced in there, we produced. And I believe we identified the name of the driver of the truck who, as Mr. Sullivan testified, he knew it, was told it before the deposition and just couldn't remember it at the deposition. So, yes, I do believe that was there. So I do not believe that the court in any way abused her discretion in denying additional discovery, particularly in light of the issues that they desired to explore, which were either fully explored during the 30B6 deposition of Pitt, Ohio, or which were not relevant to the very limited issue on which we move for summary judgment, which was the creation or the non-creation of a loading manifest from scanned documentation data. So I believe that, based on the full record, when this court evaluates it, that her summary judgment order should be affirmed and that her similar decision to deny discovery should be affirmed. And it appears I am very close to being out of time. It is. Okay. Thank you, Ms. Jankowski. Thank you. Mr. Whyte, we'll restore three minutes for rebuttal. Thank you, Your Honor. The suggestion that the no loading manifest, that the record reflects that no loading manifest was generated during these tests is correct only in the sense that there no one admitted squarely that there was a loading manifest generated. But the fact that this was active cargo. We have undisputed testimony in the record that Pitt, Ohio and its normal processes generate a strip sheet. A strip sheet that tells the people at the dock where the cargo is to go next to which truck to be delivered to its ultimate destination. That sounds to me like a loading manifest. At least we are entitled at summary judgment that a strip sheet is the equivalent to a loading. But there was no evidence from anybody that a strip sheet was created using scanned documents. Your Honor, this cargo that was the subject of these tests, it had bills of lading associated with it. Bills of lading regarding this cargo was scanned. And strip sheets were created. We're entitled to that inference. Strip sheets were created to deliver this cargo to its ultimate destination. But they always created strip sheets using the computer system they had in place without scanned documents, right? They did that anyway. They did that anyway. But in a situation where after the test they talk about the benefits to Pitt, Ohio of using the scanned images before the truck gets back to the terminal to tell the workers where they're supposed to go. Why isn't it not reasonable to infer? Because you had sworn testimony that it didn't happen. So you're saying your inference is that everyone lost. From a 30B6 witness who was not involved in the… The only witness that you sought to depose. He also gave you multiple affidavits that were drafted by you. At that stage, Your Honor, you're right. We start with a 30B6 witness. We then go out and during the 30B6 deposition we obtain the names of numerous people who were actually physically involved on the back end. Next step is to go out and talk to those actual people. But you don't get a year to get to your 30B6 witness. We got documents for the first time after the summary judgment stage had closed a week before the deposition. A week before the deposition. Documents for the very first time. And is your friend's statement true that there was nothing in those documents that you used to support your response to their motion for summary judgment? Absolutely not. Those documents established that this was active cargo. That's central to our argument here. Those documents for the first time established that this was active cargo that was actually delivered. Before then, Pitt, Ohio's position had been, well, this was just a guy in a truck driving around the terminal seeing if he could feed documents into a scanner and see if it would work. For the first time, after summary judgment closed, we learned from these documents that this is active cargo. That they actually had to, reasonably infer, generate a strip sheet at the end to figure out where this thing is going. For the first time. So, yeah. It was nine months afterwards. But we should have gotten those documents nine months before. And aren't we entitled to infer from that nine-month delay that perhaps that was not unintentional? Isn't that a reasonable inference? That we didn't get those documents until after the summary judgment briefing had been complete and a week before this deposition. At the very least, Your Honor, I would suggest that we're entitled to explore why those documents weren't produced and the fact that this was active cargo. Something we were never able to do with an actual fact. But you were able to, well, when you say nothing, I mean, with Mr. Sullivan, you were able to ask him about all this stuff. Certainly. But he had a huge hole in his testimony because he never talked to people on the back end who were key to this, including the person who authored the feasibility study. And keep in mind that these documents we got after summary judgment closed showed numerous dates, including dates after the alleged one incident of scanning. So there were several dates, six or seven different dates. There's no explanation for that. Pitt, Ohio had no explanation for that. Mr. Sullivan had no explanation for that. We never got to ask Microdia and PeopleNet about that because they didn't produce the documents until well after their deposition. So we have, after summary judgment, a week before a deposition, documents that show for the first time this is actual cargo, inferring a strip sheet was actually created, in a system that plugged in-cab scanning into it, that had the ability to generate loading manifests on the back end. And that we have multiple days of document testing and scanning, or at least documents that are dated multiple days, with no explanation. None. Did you get those documents from PeopleNet or Microdia when you made document requests to them? We did not. And nobody from PeopleNet and Microdia alluded to the existence of those multiple dates when we deposed. This was brand new stuff that we got after summary judgment and a week before Mr. Sullivan's testimony. I would respectfully suggest that we were entitled to follow up with those witnesses, and follow up with Microdia and PeopleNet, and follow up with Pitt, Ohio, and ask the question, why didn't we get these nine months ago? And it might be an innocent explanation. But your honors, it might not be. And in this situation, when you are deciding whether or not R&L is entitled to proceed, I respectfully suggest we are entitled to get the answer to that question. Okay. Thank you, Mr. White. Thank you, your honors. Mr. Jankowski, that concludes the argument. The case number 1142 is submitted. We turn to the appeal.